[Cite as *State v. Perry*, 2019-Ohio-3422.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-01-004 |
| - vs - | : | O P I N I O N<br>8/26/2019 |
| | : | |
| REGINA PERRY, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2018CR000114

D. Vincent Faris, Clermont County Prosecuting Attorney, Katherine Terpstra, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

W. Stephen Haynes, Clermont County Public Defender, Robert F. Benintendi, 302 East Main Street, Batavia, Ohio 45103, for appellant

**PIPER, J.**

{¶ 1}   Appellant, Regina Perry, appeals her conviction in the Clermont County Court of Common Pleas for permitting drug abuse.

{¶ 2}   Perry leased an apartment on Mount Carmel Tobasco Road in Clermont County Ohio and allowed her son, Tyler Liming, to live with her in the apartment. While living with his mother, Liming began operating a drug trafficking business in which he used the

"dark web" to order narcotics and other drugs. Those drugs were then delivered to the apartment and purchased by Liming's customers. Oftentimes, Liming's customers would use the recently purchased drugs with Liming in the apartment.

{¶ 3} In October 2016, an officer responded to a 911 call reporting a "nonbreather, possible overdose" at the apartment. When the officer arrived, Liming was attempting to perform CPR on an unresponsive individual, Brendann Payne, who was lying on the apartment's living room floor. Shortly thereafter, Payne flatlined at the apartment and was unable to be saved by the paramedics. After an autopsy was performed, it was concluded that Payne died from the ingestion of alcohol and a synthetic opiate known as U-47700. It was further determined that Payne died within minutes of ingesting the drug.

{¶ 4} While responding to the 911 call, the officer noticed an abandoned safe near the apartment. Because the safe was unclaimed, the officer opened the safe and discovered documentation and property belonging to Liming. The safe also contained an unlabeled bottle of pills, which were stamped as Percocets, but were later identified as U-47700. The safe was transported to the police department and the following day, one of Liming's friends attempted to claim the safe. At that time, Liming's friend was interviewed and ultimately disclosed information that prompted further investigation into Liming.

{¶ 5} Around the same time as Payne's death, Perry was having difficulties living with Liming, including issues arising from his drug abuse. As a result, Perry began searching for an apartment closer to her boyfriend and began staying with him approximately three nights a week. Thereafter, on January 30, 2017, Perry terminated her lease, and she and Liming moved out of the apartment.

{¶ 6} In September 2017 Liming was arrested on charges related to Payne's death. Specifically, Liming was indicted for providing the U-47700 substance to Payne and for committing a felony which ultimately resulted in Payne's death. In March 2018, Liming pled

guilty to one count of involuntary manslaughter and one count of aggravated trafficking in drugs. As a result of his plea, the Clermont County Court of Common Pleas found Liming guilty of violating R.C. 2903.04(A), a felony of the first degree, and R.C. 2925.03(A)(2), a felony of the third degree. Liming was also charged in a second case with engaging in a pattern of corrupt activity, which he also pled guilty to. As a result of that plea, Liming was found guilty of violating R.C. 2923.32(A)(1), a felony of the first degree.

{¶ 7} In February 2018, shortly before Liming pled guilty, Perry was indicted for permitting drug abuse in violation of R.C. 2925.13(B). According to the bill of particulars, the state alleged Perry was "the lessee, occasional occupant, and a person having custody or control of [the] apartment" and Perry allowed the apartment to be used by her son, Liming, and those associated with him for the "trafficking in a variety of drugs including * * * L.S.D., alprazolam, hashish, and U-47700." The bill of particulars further indicated that Perry knew the apartment was used by Liming's associates and customers to ingest drugs after they were purchased, and this use resulted in Payne's death.

{¶ 8} Perry pled not guilty to the charges and the matter proceeded to a jury trial. The state presented eight witnesses in its case-in-chief, and Perry did not testify or present any witnesses in her defense. The jury returned a guilty verdict, and the trial court sentenced Perry to 120 days in jail and four years of community control. Perry now appeals, raising one assignment of error.

{¶ 9} Assignment of Error No. 1:

{¶ 10} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY BECAUSE THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

{¶ 11} Perry argues the guilty verdict was against the manifest weight of the evidence because "the evidence presented * * * failed to attain the high degree of probative force and

certainty required of a criminal conviction[.]" Specifically, Perry claims the jury lost its way in concluding that Perry was the owner, lessee, or occupant or that she maintained custody, control, or supervision of the apartment in 2016.

{¶ 12} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App. 3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 13} Perry was convicted of permitting drug abuse in violation of R.C. 2925.13(B), which provides that no "person who is the owner, lessee, or occupant, or who has custody, control, or supervision, of premises or real estate, * * * shall knowingly permit the premises or real estate * * * to be used for the commission of a felony drug abuse offense by another person."

{¶ 14} After reviewing the record, we find that Perry's conviction was not against the manifest weight of the evidence. The state presented testimony from the owner and landlord

of the apartment, who testified that Perry was renting the apartment in 2016. The lease would expire and automatically renew unless Perry provided a 30-day written notice, which the landlord indicated Perry did not do. According to the landlord, Perry was not staying at the apartment "nearly as much" during the last three or four months of her lease, and he estimated she stayed at the apartment one day a week during that time. Although Perry had signed a lease at one point, the landlord testified those leases were disposed of after a tenant moved out. Thus, he could not identify the exact date Perry moved in or out of the apartment, but indicated she lived there for a total of two and a half years. Moreover, although he could not refer to the physical lease, the landlord stated he was aware of when Perry was at the apartment and confirmed it was neither sublet nor rented to anyone other than Perry during 2016.

{¶ 15} The state also presented testimony from Liming's ex-girlfriend, Kelsi Bingham. Bingham testified that she dated Liming for four or five years, and that their relationship ended in the fall of 2017. According to Bingham, in 2016 Liming was living with Perry in the apartment and Perry's lease was ending. Because Liming could not continue to live in the apartment on his own due to "past foreclosures," Perry allowed Liming to live in the apartment under her lease on a month-to-month basis. Although Perry allowed Liming to stay in the apartment, Bingham indicated Perry was in charge of the apartment, stayed at the apartment "at least three days a week," and maintained property in the apartment including bedding, furniture, clothing, and a ferret cage.

{¶ 16} Bingham then described the various drug activity she saw take place in the apartment, including the sale of drugs that were delivered in packages from the "dark web." She noted that Perry was present when the drug activity occurred, and that Perry would deliver packages of drugs to Liming that she had "intercepted." According to Bingham, Perry was also present when Liming's customers were purchasing drugs and Perry brought a

coworker to the apartment to purchase "pills" from Liming. Perry was in the apartment with Liming and his friends when they were using drugs, and occasionally partook in the drug usage with them. Bingham further indicated Perry was aware that Liming was dealing drugs out of the apartment, and asked for a part of his profits, which he then paid to her.

{¶ 17} Bingham further testified that Perry admitted the safe found near the apartment the day of Payne's death belonged to Perry. Specifically, according to Bingham, Perry contacted her a year after Payne's death and accused Bingham of stealing the safe from the apartment on the night of Payne's death.

{¶ 18} The state then presented testimony from the detective who was assigned to investigate Liming and his associates, including Perry, after Payne's death. The detective testified that through his investigation of Liming, he became aware that Perry was Liming's mother, Payne's death occurred at Perry's residence, and that the residence was associated with "a good portion" of the packages and drug activity.

{¶ 19} During his investigation, the detective began monitoring the calls Liming made while in custody. The jury heard several calls between Liming and Perry, and one between Perry and the mother of Liming's child, who was also in custody at that time. During those calls, Perry indicated Liming was charged with involuntary manslaughter for someone dying in the apartment, which she referred to as "our house." She expressed concern that charges would be brought against her because it was at her apartment that "everything" was being done, and because she knew what was going on. She also exhibited intimate knowledge of Liming's drug trafficking. For example, Perry indicated she knew Liming was receiving drugs through the mail, was aware of which associates were helping Liming sell drugs, and knew that Liming was selling drugs out of the apartment. She further noted to Liming that he could receive additional indictments for packages that were delivered after he was initially charged. Throughout each recording Perry appeared worried and reiterated on several occasions that

because it was "her house," she could be charged.

{¶ 20} The detective also testified to certain Facebook records he retrieved from Perry's account, including messages between Perry and various individuals. The detective read messages to the jury from October 2016, shortly before Payne's death. In those messages, Perry told a friend that Liming was staying at her house on "Mount Carmel" and that the friend could stop by some time. To another friend, Perry indicated that she had to stay with her boyfriend that evening because Liming was "tripping on acid." Perry then stated that she had found an apartment less than one mile from her boyfriend. However, messages from November 2016 revealed Perry was still staying at the apartment three or four days a week at that time, and that her new apartment was not ready.

{¶ 21} The jury also heard messages between Perry and Liming which took place throughout January 2017. In those messages Perry stated she would inform the landlord that Liming was leaving and confirmed that Liming and Bingham did not sign a new lease. She also discussed a dispute she had with the landlord, wherein she told him to quit calling Bingham because it was Perry's apartment, not Bingham's apartment, and Perry further indicated the only harm the landlord could do was to her credit. By the end of January, Perry wrote that the landlord was threatening to evict her, and on January 30, 2017 she went to "get [her] stuff out of the apartment."

{¶ 22} The detective also read messages from Perry describing Liming's charges and Payne's death. In those messages, Perry indicated Liming was charged with involuntary manslaughter because when Liming was living in her apartment "some kid" died in it. She further wrote that she was scared because it was her apartment.

{¶ 23} Near the end of his testimony, the detective discussed the charges that were brought against Liming and the convictions that stemmed from those charges. He confirmed that the convictions against Liming were based, at least in part, on the detective's

investigation, which was based upon activities that happened at the apartment.

**{¶ 24}** In light of the evidence presented at trial, we find the jury did not lose its way in concluding that Perry was the owner, lessee or occupant of the apartment or that she had the requisite custody, control, or supervision over the apartment to satisfy R.C. 2925.13(B). Perry first argues that because her lease expired, she was a "tenant at sufferance" of the apartment, and therefore, could not be considered a lessee under the statute. Perry also claims she could not be described as having control or supervision of the apartment because she had moved out of the apartment by the fall of 2016, and the trafficking of drugs began thereafter. We reject Perry's arguments.

**{¶ 25}** The landlord's testimony, if believed, established that after Perry's lease expired, it was automatically renewed every 30 days unless Perry provided the landlord written notice that she was terminating the lease. Perry did not provide the landlord with such notice and did not move out of the apartment until January 2017, when the landlord threatened to evict her. Additionally, the record indicates the only leaseholder for the apartment was Perry, which is a fact uncontroverted by Perry. Moreover, it is evident that Perry was aware she was responsible for the apartment, given that she directed the landlord to express any concerns regarding the apartment to her, not Liming or Bingham, and she knew her credit could be affected. Additionally, the statements made by Perry in her Facebook messages and phone calls confirm that she continued to consider the apartment as her home in the fall of 2016, even when staying with her boyfriend a few days a week. The record further shows that Perry was free to come and go as she pleased and maintained personal belongings in the apartment until late January 2017.

**{¶ 26}** Moreover, the record shows Perry was acutely aware of Liming's drug trafficking prior to leaving the apartment. Perry displayed knowledge of Liming's "dark web" packages and that drugs were being delivered to the apartment through the mail. The record

further indicates Perry knew Liming was selling drugs from the apartment and that she participated in the drug trafficking by providing customers to Liming and by receiving a portion of Liming's profits. Furthermore, the jury heard Perry state on the recordings that she was concerned with the activities she allowed to occur at her apartment and was worried that she would be charged for her involvement.

{¶ 27} In light of the above, Perry cannot now claim to have fully vacated the apartment and surrendered all custody, control, and supervision of the apartment to Liming at the time of Payne's death. As a result, we find that the evidence displaying her access to and consistent presence at the apartment supported the jury's finding that Perry was the lessee or occupant of the apartment or that she had the requisite custody, control, or supervision over the apartment in the fall of 2016.

{¶ 28} Accordingly, the jury's guilty verdict and Perry's conviction was not against the manifest weight of the evidence, and Perry's assignment of error is overruled.

{¶ 29} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.